James C. Shah (SBN 260435)
Kolin C. Tang (SBN 279834)
**MILLER SHAH LLP**
8730 Wilshire Blvd., Suite 400
Los Angeles, CA 90211
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
jcshah@millershah.com
kctang@millershah.com

Steven Lowe (SBN 122208)
**LOWE & ASSOCIATES LLP**
8383 Wilshire Boulevard, Ste. 1038
Beverly Hills, CA 90211
Telephone: (310) 477-5811
steven@lowelaw.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL TINO, an individual,<br><br>        Plaintiff,<br><br>v.<br><br>A24 FILMS LLC, HOME BOX OFFICE, INC., MOSAIC MEDIA GROUP, KYLE MOONEY, and EVAN WINTER,<br><br>        Defendants. | CASE NO. _____<br><br>**COMPLAINT FOR DAMAGES FOR:**<br><br>**1. COPYRIGHT INFRINGEMENT;**<br>**2. CONTRIBUTORY COPYRIGHT INFRINGEMENT; AND**<br>**3. DECLARATORY RELIEF.**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Daniel Tino ("Plaintiff"), brings this action to recover damages for copyright infringement against Defendants, A24 Films LLC ("A24"), Home Box Office, Inc. ("HBO"), Mosaic Media Group ("Mosaic"), Kyle Mooney ("Mooney"), and Evan Winter ("Winter") (collectively, "Defendants"), for their unlawful appropriation and distribution and use without compensation, of Plaintiff's original and copyrighted work, a screenplay entitled *Y2K* (the "Screenplay").  Plaintiff states as follows for his Complaint:

## I.   NATURE OF THE CASE

1.   Defendants engaged in a scheme to copy and/or use significant portions of the screenplay, resulting in the production of the film Y2K ("the Film"), which was produced by A24 and Mosaic-managed Mooney and Winter, and released to the public via box office and HBO's online streaming service, HBO Max, in 2024.  Defendants have denied Plaintiff derivative market exploitation opportunities, revenues and profits, creative attribution, integrity, market share, and other origination credits and compensation to which he was lawfully entitled.

2.   Defendants had access to Plaintiff's Screenplay prior to and throughout the process of creating and producing the Film.  Mosaic had direct access to the screenplay when it was presented to Mosaic's Film and TV Director of Development in 2018 at a Screenwriter's Showcase.  Defendants claim that the Film, which copies substantial expressions of themes, settings, characters, plot, and sequence of events from Plaintiff's Screenplay, was written by Kyle Mooney and Evan Winter, who, at all relevant times, were managed by or otherwise had a professional connection to Mosaic.[1]

3.   Plaintiff charges Defendants with violations of 17 U.S.C. § 106.

---

[1] Mosaic has served as talent representation for both Defendants Kyle Mooney (2014) and Evan Winter (Present) who are purportedly the two writers credited on the infringing Film.

2
COMPLAINT

Pursuant to 17 U.S.C. § 501(a), "[a]nyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright or right of the author, as the case may be."  Defendants' blatant copying of Plaintiff's work without permission or consideration is precisely what 17 U.S.C. § 501(a) prohibits.

4.    Plaintiff seeks to recover damages for copyright infringement by Defendants, including injunctive relief, actual damages, statutory damages, lost profits, attorneys' fees and costs, and pre- and post-judgment interest pursuant to 17 U.S.C. § 504.

## II.    PARTIES

5.    Plaintiff is a resident and citizen of the state of California.

6.    Defendant A24 Films, LLC is a limited liability company duly governed under the laws of the State of Delaware, with its principal place of business in New York, and is duly qualified to and does transact business in the state of California, County of Los Angeles.

7.    A24 is an independent entertainment studio that produces and distributes films and television shows throughout the United States, including in California.

8.    Defendant Home Box Office, Inc. is a corporation duly incorporated under the laws of the State of Delaware, with its principal place of business in New York, and is duly qualified to and does transact business in the State of California, County of Los Angeles.

9.    HBO is a subsidiary of Warners Bros. Discovery and provides multinational media and entertainment including film and television streaming throughout the United States, including California.  "HBO Max" is a proprietary unit of HBO and is the streaming service upon which HBO hosts its on-demand offerings, including the Film.

10.    Defendant Mosaic Media Group, Inc. is a corporation duly incorporated under the laws of the State of Delaware, with its principal place of

COMPLAINT

business in Los Angeles, California.

11. Mosaic provides talent management and production services throughout the United States, including California.

12. Defendant Kyle Mooney is a resident of the state of California. Mooney is credited as a writer and director for the Film. Mooney was a client of Mosaic in 2014, and, upon information and belief, has maintained a professional connection with the company ever since.

13. Upon information and belief, Defendant Evan Winter is a resident of the state of California. Winter is credited as a writer and producer of the Film. At all relevant times, Winter was a client of Mosaic.

## III. JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 ("federal question jurisdiction") and § 1338(a) (actions arising under any Act of Congress relating to copyright claims) because Plaintiff seeks injunctive relief, statutory damages, monetary damages, and interest under the laws of the United States and, more specifically, Acts of Congress relating to copyrights. The matter in controversy exceeds, exclusive of interest and costs, the sum specified in 28 U.S.C. § 1332.

15. This Court has personal jurisdiction over Defendants because some or all of the acts prohibited by 17 U.S.C. § 501(a) alleged herein took place in this District.

16. Venue is properly laid in this district pursuant to 28 U.S.C. § 1400(a) and (b), because a) Plaintiff resides in this District and/or b) Defendants are registered, transact business, or have offices in this District.

## IV. PLAINTIFF CREATED AND OWNS THE *Y2K* SCREENPLAY

17. In 2016, during his enrollment in University of California, Los Angeles' ("UCLA") Professional Program in Screenwriting, Plaintiff began writing the Screenplay. The Screenplay was a coming-of-age story inspired by his

4
COMPLAINT

real-life experiences in 1999.

18.     Plaintiff continued to develop and refine the Screenplay throughout 2016 and 2017, when he was a Master of Fine Arts candidate with UCLA's Screenwriting program, and even worked to improve the Screenplay as the focus of one of his workshop projects.

19.     Several of Plaintiff's original screenplays have won and placed highly in their categories at the annual Screenwriters Showcase hosted by University of California, Los Angeles' School of Theater, Film, and Television ("UCLA TFT").

20.     In fact, Plaintiff won the 2017 Screenwriters Showcase for Comedy as a first-year graduate student ("Breaking Up Shiva") and received runner-up for the 2018 Screenwriters Showcase for Dramatic Film ("Nasty Nancy").

21.     In recognition of his achievements, Plaintiff was chosen as one of four promising screenwriters to attend UCLA's inaugural UCLA TFT/Université Côte D'Azur Storytelling Institute program in Cannes, France.

22.     In anticipation of entering the Screenplay into the 2018 Screenwriters Showcase ("2018 Showcase") hosted by UCLA TFT, Plaintiff registered the copyright for *Y2K* with the U.S. Copyright Office, with an Effective Date of Registration of July 20, 2017 (Registration No. PAu 3-867-945).

23.     Plaintiff submitted the Screenplay to the 2018 Showcase on or about March 16, 2018.

## V.     COPYRIGHTABLE ELEMENTS

24.     Copyright infringement is established where a plaintiff is able to establish that he owns the copyright and that the infringer copied protected elements (or a protected combination of elements) of the original work.

25.     Copying may be shown through evidence of direct copying or a showing that either: (1) the works are substantially similar and the defendant had access to the plaintiff's work, or (2) in the absence of evidence of access, there is striking similarity between the works.

26.    Ownership was vested for the Screenplay and its expressions when Plaintiff fixed the screenplay in a tangible medium under 17 § USC 102(a). Furthermore, Plaintiff registered his original work of authorship with the U.S. Copyright Office on July 20, 2017.  The Screenplay thus is fully protected pursuant to 17 U.S.C. § 101 *et seq.* ("the Copyright Act").

27.    The Ninth Circuit employs a two-part analysis, consisting of an "extrinsic test" and an "intrinsic test," to determine whether two works are substantially similar.

28.    The intrinsic test is a subjective evaluation, focusing on whether an ordinary, reasonable audience would perceive the works as substantially similar in their overall concept and feel.

29.    The extrinsic test is an objective one that focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events.

30.    Under the extrinsic test, protectable expression includes the specific details of an author's rendering of ideas, or the actual concrete elements that make up the total sequence of events and the relationships between the major characters.

31.    The extrinsic test may be satisfied by demonstrating a similar pattern of unprotectable elements via the "selection and arrangement" test.  Even where elements of a work are not independently protectable, substantial similarity can nonetheless be established through an original selection, coordination, or arrangement of unprotectable elements.

## VI.    DEFENDANTS INFRINGED UPON PLAINTIFF'S COPYRIGHT

32.    In the wake of the 2018 Showcase, Defendants Mosaic, Winter, and Moony intentionally, blatantly, and without authorization, copied the work of Plaintiff.  Setting, characters, plot, sequence of events, themes, tone, dialogue, and even the title from Plaintiff's *Y2K* Screenplay have been copied by Defendants Mosaic, Winter, and Moony into the Film.

33.    Defendants A24 and HBO produced, published, and distributed the Film, which copies substantial portions of Plaintiff's Screenplay.

34.    The Film, an unauthorized copy and appropriation of the Screenplay, was produced and subsequently released theatrically in the United States by Defendant A24 on December 6, 2024, and falsely represented to have been written by Defendants Mooney and Winter.

35.    The Film was later distributed to the public through Defendant HBO's online streaming service, HBO Max, throughout the United States on December 24, 2024, without the approval of Plaintiff.

**A.    Defendants Mosaic, Winter, and Moony Had Access to the Screenplay While Producing the Film**

36.    In March 2018, Nathan Allen, one of the student organizers of the 2018 Showcase, invited Michael Lasker ("Lasker"), a manager at Defendant Mosaic, to serve as one of the judges for the Showcase.

37.    Lasker appointed Morgan Pichinson ("Pichinson"), the Film and TV Director of Development at Mosaic, to be a Judge in his place.  Pichinson participated in the 2018 Showcase as a Judge, and undisputably was one of the limited number of judges who read, reviewed, and scored Plaintiff's Screenplay.

38.    Mosaic accessed the Screenplay via the 2018 Showcase.

39.    Through Pichinson's participation as a Judge in the 2018 Showcase, Defendant Mosaic had ready and direct access to the Screenplay.  As Director of TV and Film development at Mosaic, Pichinson was in a position to transmit the Screenplay to her colleagues at Mosaic, including Lasker, and to Winter, and indubitably had a vested interest in advancing the careers of the film and television writers and producers represented by and connected to the company.  Thus, there is a common subject matter between Mosaic and Mosaic's writers, Mooney and Winter.

40.    Lasker directly manages or managed Defendant Winter, who is

credited as a writer and producer of the Film.

41.    Mosaic also previously represented Defendant Mooney, who is credited as a writer and director on the Film.  On information and belief, Mosaic and Mooney have maintained a professional connection since the agency served as his talent representation in 2014 (and thereafter).

42.    Pichinson's connection with Mosaic and Mosaic's clients constitutes a clear line of access between an individual who acquired the Screenplay and the writers of the Film.  The credited writers of the Film therefore had a reasonable opportunity to view Plaintiff's screenplay, and there is a reasonable possibility that they actually did.  Upon information and belief, they actually did.

**B.    The Film is Substantially Similar to the Screenplay**

43.    Many of the extrinsic elements of creative expression in the Screenplay and the Film are substantially similar.  Both the Screenplay and the Film feature the same title, setting elements, characters, plot points, sequences of events, themes, tone, and dialogue.  At a minimum, the original selection and arrangement of these elements in the Screenplay have been copied by the Film.

44.    Indeed, the Film's entire first act follows and closely copies the Screenplay.

### i.  Title

45.    The Screenplay and Film are both titled *Y2K*.

### ii.  Setting

46.    The Screenplay and the Film are both set in an American suburb, specifically on December 31, 1999, and focus on the events leading up to and surrounding the turn of the millennium.

47.    Both stories start with scenes in private places: basements, or in the case of the Film, backrooms of video rental stores, in which the main characters can freely smoke weed, play video games, and spew various profanities.  These spaces are representative of the social withdrawal of the main characters and

standard settings of a "teenage stoner" story.

48.    Eventually, in both the Screenplay and the Film, the action moves to absent parents' homes, and then, ultimately, turns to the high school attended by the main characters but class is not in session.

### iii.   Characters

49.    The "Protagonist" in both the Screenplay (Kev) and the Film (CJ) is an unassuming high school boy who lives on the fringes of the popular in-group and has close friendships with nerdy video-game-playing stoners.

50.    In the Screenplay, Kev is characterized as an alternative, Radiohead-obsessed boy whose personality is deeply entrenched in a love of non-mainstream music.  Kev frequently smokes marijuana throughout the events of the plot.

51.    In the Film, CJ is characterized as an alternative, hip-hop obsessed boy whose personality is deeply entrenched in a desire to reject mainstream music and art.  CJ frequently smokes marijuana throughout the events of the plot.

52.    A group of nerdy video-game-playing stoners is the main social feature of both the Screenplay (Kev, Jay, and Matt) and the Film (Eli and Danny). They are portrayed as geeky teenagers who form a social refuge against a judgmental, hierarchical high school totem pole while attempting to navigate teenage romance.  Their playful banter captures the vernacular of the early-2000s.

53.    In the Screenplay, three high-school aged teenagers named Kev, Jay, and Matt are regarded as social outcasts and seek to improve their social status, in part by attempting to strike up romantic relationships.

54.    In the Film, three high-school aged teenagers named Eli, Danny, and CJ form the trio.  Two of the boys, Eli and Danny, are regarded as social outcasts seeking to improve their social status in part by attempting to strike up romantic relationships.  The third male protaginist in the Film, CJ, is also an outcast.

55.    In both works, one member of the trio (Matt-Eli) has an unfulfilled crush on a girl in the popular in-group and eventually "get the girl" (Stacey and

Laura, respectively) in the end.

56.    In both the Screenplay and the Film, the trio is depicted as aimlessly hanging out and smoking weed, and in both, the imminent threat of the Y2K virus forces them outside their comfort zone into the real world.

57.    The *carpe diem* attitude adopted by the Screenplay's trio is in stark contrast to the typical depictions of the lethargic and/or isolated stoner loner trope. The Film blatantly copies this unique characterization for its own trio.  The depiction, relationship, and nuances of the three characters which form the basis of both works, is therefore a protectable combination of elements in and of itself, but *especially* in combination with all the other similar elements set forth here-below, of which there are unique creative elements.

58.    The artistic female in both the Screenplay (Nikki) and the Film (Ash) is an "alternative" camera girl who plays the role of documentary archivist who forms a key relationship with a male protagonist, Kev in the Screenplay, CJ in the film.

59.    In the Screenplay, Nikki is an alternative, artistic girl who carries an archaic camera everywhere she goes to document the events of the night and is deeply interested in an iconic 1990s band.  Her old-school documentary role solidifies that the Screenplay is a period piece.

60.    In the Film, Ash is an alternative, artistic girl who carries an archaic camera everywhere she goes to document the events of the night and is deeply interested in an iconic 1990s band.  Her old-school documentary role solidifies that the Film is a period piece.

61.    In the Screenplay, Nikki represents an original and innovative element of Plaintiff's storytelling.  She is presented as counter-cultural yet is part of the popular in-group and becomes central to the trio.  She is also not relegated to a mere love interest role.  The depiction of Nikki is therefore a unique creative element, which, when combined with the main characters of both works,

10
COMPLAINT

constitutes a protectable selection and arrangement of elements.  Her contradictory roles and aspects make her character less readily categorizable and make Defendants' copy job with Ash all the more apparent.

62.    In both the Screenplay and the Film, the camera girl's presence contributes to an uneasy feeling that Y2K might be the last New Year's Eve that this group of young people may ever experience.

63.    Additionally, the parallel Protagonists of Kev and CJ have substantially similar relationships with the parallel camera girls, Nikki and Ash.

64.    Throughout the Screenplay, Kev and Nikki bond over their shared love of alternative music, as Nikki records the entire evening with a camera.  Their bonding is facilitated by recreational drug usage, and they ultimately develop a romantic relationship.

65.    Throughout the Film, Ash and CJ bond over their shared appreciation for music, as Ash records the entire evening with a camera.  Their bonding is facilitated by recreational drug usage, and they eventually develop a strong relationship.

66.    The indie rock star cameo is from an iconic 1990s band that the camera girl idolizes in both the Screenplay (Radiohead's Thom Yorke) and the Film (Limp Bizkit's Fred Durst).

67.    Yorke's presence in the Screenplay, and his impromptu appearance, is unexpected and unique.  The Film's parallel cameo with Durst seems to be entirely lifted from the Screenplay.

68.    The parents of the protagonists (Kev and Eli) are laid back, permissive, and portrayed in a manner that is far from stereotypical in both the Screenplay (Barbara and Ronald) and the Film (Robin and Howard).

69.    In the Screenplay, the depiction of Kev's parents is one of Plaintiff's original innovations.  In the coming-of-age genre, parent characters are typically portrayed as controlling, more conservative, and attached to the status quo,

particularly when the narrative centers their laid back children.  In contrast, Barbara and Ronald are surprisingly and almost comically laid back.  They lean into the same mentality as the teenagers, treating the change in the millennium as a moment to let go and enjoy.

70.   In the Film, Eli's parents follow Plaintiff's approach with Barbara and Ronald.  Robin and Howard are laid back, permissive, and atypical for the genre.

71.   In the Screenplay, Barbara and Ronald are playful and lighthearted about drug use.  They end up high on mushrooms and are shown to have a good time.

72.   In the Film, Robin and Howard are similarly relaxed and portrayed as cool parents.  Robin asked for a hit of a joint and is shown to be laid back about drug use.

73.   These similarities between no less than seven of the main characters of both works at issue is a "strikingly similar" combination of elements which defies the possibility of independent creation in and of itself.

### iv.   Plot and Sequence of Events

74.   The opening scenes of both narratives involve a news broadcast that places both the stories at the exact same moment in time: December 31, 1999, in a world facing the existential threat of the turn of the century and the impending Y2K virus.

75.   The Screenplay's plot is initiated by a central group of friends (Kev, Jay, and Matt) playing video games while deciding how to spend their New Year's Eve and discussing where to find weed.  This scene features a news broadcast serving as a harbinger for potential societal collapse from the Y2K superbug.

76.   The Film's plot is initiated by a news broadcast serving as a harbinger for potential societal collapse from the Y2K superbug, followed by the introduction of a central pair of friends (Eli and Danny) playing video games while deciding how to spend their New Year's Eve.

77. In the Screenplay and the Film, the plot initiates with best friends playing video games and actively seeking out weed to get stoned together, uncertain what their plans are going to be for New Year's Eve, and propelled by the threat of the world ending to gain the courage to face social situations they may normally feel uncomfortable in.

78. The opening sequence is not the only substantially similar plot point between the Screenplay and the Film. Each story contains many strikingly similar elements that propel both narratives to unfold in virtually the same manner. These elements combined with the characters set forth hereinabove continue an independently protectable combination of elements that was copied in the infringing work.

79. In fact, the overall thrust of each plot is the same: a group of kids on the run from a threat that is in turn both frightening and comedic.

80. In the Screenplay, the central group of friends impulsively decides to host a party on New Year's Eve, aided by the theft of alcohol from a former teacher.

81. In the Film, the central group of friends impulsively decides to attend a party on New Year's Eve, aided by the theft of alcohol from both a store and the parents of a main character.

82. In the Screenplay, a protagonist's parents enter a hallucinogenic state as a result of accidentally ingesting mushrooms.

83. In the Film, a protagonist's parents enter a hallucinogenic state as a result of being microchipped without their knowledge. The similarity of such unique creative elements defies the probability of independent creators.

84. In the Screenplay, the central group of friends leaves their home before being abruptly stopped and harassed by an antagonistic police officer on foot.

85. In the Film, the central duo leaves their home and reaches a video

store, where they are abruptly stopped and harassed by an antagonistic bully.

86.    In both the Screenplay and the Film, romantic tensions become the focal point of a dispute between characters at the New Year's Eve party.

87.    In the Screenplay, two central characters engage in a heated dispute at the party, primarily regarding the attention that one character receives from women.  The friends later reconcile.

88.    In the Film, two central characters engage in a heated dispute at the party, primarily regarding the attention that one character receives from women. The friends later reconcile.

89.    In the Screenplay, a power blackout occurs at the party near midnight, a harbinger of the potential Y2K superbug.

90.    In the Film, a power blackout occurs at the party at midnight due to the Y2K superbug.

91.    In both the Screenplay and the Film, figureheads from the iconic 1990s band who are fixations of parallel characters, Nikki and Ash, make appearances during significant musical plot points.  Not only are these cameos from real life musicians deployed to the exact same comedic effect, but these musicians are strikingly similar: they are part of a majorly successful band and have a celebrity cache on their own.

92.    In the Screenplay, Thom Yorke of iconic 1990s band, and camera-girl Nikki's obsession, Radiohead, makes a spontaneous appearance during the plot's musical climax.

93.    In the Film, Fred Durst of iconic 1990s band, and camera-girl Ash's obsession, Limp Bizkit, spontaneously appears during the rising action of the plot and contributes to its musical climax.

94.    In the Screenplay, one of the main characters, Kev, is a performer with an acoustic guitar in the musical climax.

95.    In the Film, one of the main characters, Ash, is a performer with an

acoustic guitar in the musical climax, mirroring Kev's role. While Kev's guitar skills are established throughout the story in the Screenplay, Ash's skills seemingly arise from nowhere in the Film and are clearly modeled on Kev's demonstrated abilities.

96. In both the Screenplay and the Film, outsider teenagers energize the party with music and give the main characters validation.

97. In the Screenplay, Kev's live band performance gives his character validation and a higher social footing, while also energizing the party.

98. In the Film, Eli and Danny's CD mix gives their characters validation and a higher social footing, while also energizing the party.

99. In both the Screenplay and the Film, one of the male characters has an unfulfilled crush on a girl who is in the popular group, and despite striking out with her at first, ends up with her in the end.

100. In the Screenplay, a male character (Matt), a social outcast, strikes up an unlikely romantic connection with a popular girl. His romantic interest is established early in the plot of the Screenplay.

101. In the Film, a male character (Danny), a social outcast, strikes up an unlikely romantic connection with a popular girl. His romantic interest is established early in the plot of the Film.

102. In both the Screenplay and the Film, the protagonist's best friend sacrifices himself for a protagonist.

103. In the Screenplay, Kev offers to directly step in front of the gun aimed at Jay.

104. In the Film, Danny sacrifices his life for Eli in order to save him from the malevolent robot killers.

### v. Themes

105. The Screenplay and the Film share substantially similar thematic expressions and elements that work to advance the plot and highlight the central

motifs, most of which are also shared between the stories.

106. The predominant and overarching theme of both the Screenplay and the Film is the importance of seizing the moment during times of precarity, particularly as it pertains to the existential fear tied to the impending Y2K millennium.

107. For example, the opening sequences of both the Screenplay and the Film revolve around a news broadcast which bolsters the paranoia surrounding the imminent turn of the century as one of the central motifs of each work.

108. The Screenplay features a unique application of the *carpe diem* theme to the turn of the millennium and to teenage boys.

109. The Film replicates the Screenplay's central *carpe diem* theme and similarly situates it in the turn of the millennium with teenage boys.

110. The topical bedrock of both the Screenplay and the Film also centers around the loneliness of being an outsider in high school, and the use of friendship, identity, and rebellion in response to, and as an escape from, harsh realities such as high school hierarchies and Y2K.

111. In the Screenplay, the protagonists build a stronger friendship and bond in the face of the danger threatened. This is displayed when one of the friends (Jay) is threatened at gun point and the other (Kev) steps in the way, preparing to sacrifice himself to save his friend.

112. In the Film, the protagonists also build a strong friendship and bond in the face of the danger of the millennium, displayed when one of the friends (Danny) sacrifices himself to save the other (Eli).

113. The Screenplay's theme of teenage loneliness is also unique when situated against the backdrop of the Y2K context. Paired with the central theme of seizing the day, the Screenplay expresses an original and innovative blend of themes.

114. Both the Screenplay and the Film also feature teenagers bristling to

defy the norms of the suburban environments that they live in through their taste in music.

115.   While music may be a *scène à faire*, the specific discussion in both narratives is strikingly similar: the main characters use music as a method of differentiation from the mainstream, as well as a method of bonding and finding their people.  More specifically, in the Screenplay and the Film, music is used as a means for the protagonists to find salvation and self-expression.

116.   In the Screenplay, the musician outsider (Kev) and artistic camera girl (Nikki) develop a romantic relationship due to their shared appreciation of the same music.  The climax of the Screenplay also features a musical performance by Kev, which is the means through which he finds his ultimate salvation: beginning a new chapter of his life.

117.   In the Film, the musician outsider (CJ) and the artistic camera girl (Ash) develop an unlikely relationship due to their shared appreciation of music.  The climax of the Film features a musical performance by Ash that allows the protagonists to have their ultimate salvation: saving the world from destruction by robot apocalypse.

### vi.   Tone and Dialogue

118.   The overall tone of the Screenplay is distinctive.  It is both nostalgic and ironic, marked by a group of teenagers fleeing from a threat, while infusing these sequences with humorous, almost madcap, comedic energy.

119.   The dialogue conveys the Screenplay's tone well.  The dialogue features a very specific revisitation of "teenage boy humor" in this period.  It foregrounds frequent emasculating references to genitalia, endlessly refers to the main female love interest's large breasts, and conveys an ongoing anxiety about virginity.

120.   The Screenplay's dialogue centers around teenage boys, but is unique in the way it tweaks its tonal registers.  The boys' vernacular is funny, earnest, and

simultaneously ironic in its predictability.  It includes both clichés and topical idioms.

121.   The Film sets a strikingly similar tone, through use of similar teenage boy humor and dialogue choices, which in some instances appear copied from the Screenplay.

122.   On the surface, the Film's second act seemingly lurches into a different tone and genre territory than the Screenplay, by fusing the coming-of-age early 2000s elements (act one) with an over-the-top robot takeover storyline (act two).  In reality, the sudden divergence in the Film's tone—which is jarring in nature—demonstrates how extensively Defendants cannibalized the Screenplay for the first act of the Film.

123.   The awkwardness of the juxtaposition of the teenage comedy taken from the Screenplay with the horror elements forced in by the Film only heightens what is original in the Screenplay and what was copied from it for the Film.  The mid-film genre switch is little more than a poor attempt at concealing the theft.

### vii.  Selection and Arrangement

124.   The Screenplay utilizes an original and unique selection and arrangement of the elements discussed above.

125.   The Film's selection and arrangement of elements copies the selection and arrangement of many of the elements contained in the Screenplay, all the way down to the name they share.

126.   The Film's writers, Defendants Mooney and Winter, could have chosen anything as the subject matter of his coming-of-age teenage period piece. Tellingly, they chose to utilize Plaintiff's exact formula: video-game-playing, pothead teenage boys who are social outsiders, who dare each other to enjoy their potential last hurrah in the face of the threat of the Y2K virus, only to be faced with chase sequences, initially unrequited romances, and conflict—and then bonding—over niche music tastes.

COMPLAINT

127. From the title to way the setting and characters are specifically constructed, to the sonic, emotional, and thematics cruxes, the parallels between the Screenplay and the Film are compelling.

## VII.   CAUSES OF ACTION

### COUNT I
### Copyright Infringement
### (Against Defendants Winter, Mooney, A24, and HBO)

128. Plaintiff incorporates by reference as though fully set forth herein all preceding paragraphs of this Complaint.

129. On December 6, 2024, A24 released *Y2K* crediting Mooney and Winter as writers, Mooney as the director, and Winter as a producer.

130. As alleged hereinabove, the named Defendants have infringed upon Plaintiff's copyright by copying wholly original elements from Plaintiff's Screenplay *Y2K*, without any permission, in the *Y2K* Film.

131. Upon information and belief, the named Defendants thereafter intentionally broadcast, distributed, published, sold, conveyed, and otherwise exploited the Screenplay without authorization, in violation of Plaintiff's rights.

132. 50. Upon information and belief, the named Defendants have intentionally violated the Federal Copyright Act, Title 17 U.S.C. § 101 *et seq.*, entitling Plaintiff to all damages and remedies provided by the Act.

133. Said infringement entitles Plaintiff to actual and statutory damages, lost profits, injunctive, and other relief provided by the Copyright Act.

### COUNT II
### Contributory Copyright Infringement
### (Against Defendant Mosaic)

134. Plaintiff incorporates by reference as though fully set forth herein all preceding paragraphs of this Complaint.

135. On information and belief, Mosaic violated Plaintiff's exclusive right

to prepare, exploit, distribute, publish, and create motion pictures and other derivative works based upon the copyrighted works entitled *Y2K*. This was done via an orchestrated, willful, and malicious effort by Mosaic, and other Defendants, to steal the core plot and story of Plaintiff's copyrighted expression, camouflage it, and pass it off as the *Y2K* Film, in order to derive profits and to derive associated credits flowing from the motion picture industry.

136. Mosaic had access to Plaintiff's protectable expression set forth in its copyrighted and owned works entitled *Y2K*, as alleged herein, which is proven by the Judges' comments for the 2018 Showcase which demonstrate that Pichinson (an agent of Mosaic) reviewed and judged the Screenplay.

137. Upon information and belief, Mosaic knew or should have known of the direct infringement of the original Screenplay set forth in the first claim for relief set forth herein above. Mosaic had firsthand knowledge of the direct infringement of the story.

138. Mosaic's dissemination of the story to Defendants A24, Mooney, and Winter provided each of the named Defendants knowledge of the story and therefore, caused the direct infringement.

139. The infringing work, The Film, was released by the Defendants involved in the distribution and exploitation of this infringing work in theaters worldwide.

140. Upon information and belief, Mosaic contributed to the infringement of the copyrighted Screenplay, for its own profit and benefit.

141. Defendants camouflaged the original Y2K Screenplay. Mosaic used its personal connections within the conspiracy to orchestrate the infringement and derive profits therefrom. Mosaic funded, disseminated, distributed, and exploited the Screenplay for its profit and benefit.

142. The *Y2K* Film is substantially similar to, if not strikingly similar to, the Y2K Screenplay and all of the related copyrighted, protected expression

20
COMPLAINT

intended for use in a motion picture owned by Plaintiff.  Defendants copied material and high quantities of Plaintiff's protectable expression found within its aforementioned copyrighted works.

143.   Mosaic was aware of, encouraged, aided, and benefited from infringing upon Plaintiff's copyrights related to the Screenplay.

144.   Upon information and belief, Mosaic has intentionally contributed to violation of the Federal Copyright Act, Title 17 U.S.C. § 101 *et seq.*, entitling Plaintiff to all damages and remedies provided by the Act.

**COUNT III**
**Declaratory Relief**
**(Against All Defendants)**

145.   Plaintiff incorporates by reference as though fully set forth herein all preceding paragraphs of this Complaint.

146.   An actual dispute and controversy now exists between the Defendants and Plaintiff as to whether Plaintiff should be entitled to compensation, and credit as writer and creator of the *Y2K* Film.

147.   Plaintiff believes that he is both entitled to compensation, and credit as writer of the *Y2K* Film.

148.   Plaintiff is informed and believes and on that basis alleges, that Defendants dispute Plaintiff's contentions. Plaintiff therefore desires and requests a judicial determination and declaration of the respective rights and obligations of the parties.

**VIII.  <u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff prays for the following relief:

1.   For a preliminary and permanent injunction enjoining Defendants from infringing the copyrights of Plaintiff in any manner;

2.   For actual damages and profits according to proof;

3.   That Defendants be required to pay to Plaintiff such damages as

Plaintiff has sustained in consequence of Defendants' infringements of Plaintiff's copyright and to account for all gains, profits, and advantages derived by Defendants by his or her infringement of Plaintiff's copyright or such damages as the court shall deem proper within the provisions of the copyright statute;

4. That Defendants deliver up to be impounded during the pendency of this action all copies of said infringing work as in its possession or under its control and deliver up for destruction all infringing copies and all plates, molds, or other matter used to make infringing copies;

5. For declaratory relief to credit and pay Plaintiff as a writer of the *Y2K* Film, and to credit and pay Plaintiff as the writer on all future broadcasts, DVD releases, licenses, etc. of the Film, without exclusion;

6. For an accounting;

7. For costs of suit and interest; and,

8. For such relief that the Court deems just and proper.

## IX.    DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues permitted by law.

Dated: July 2, 2026                    **MILLER SHAH LLP**

*/s/ James C. Shah*
James C. Shah (SBN 260435)
Kolin C. Tang (SBN 279834)
8730 Wilshire Blvd., Suite 400
Beverly Hills, CA 90211
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jcshah@millershah.com
          kctang@millershah.com

COMPLAINT

Steven Lowe (SBN 122208)
**LOWE & ASSOCIATES LLP**
8383 Wilshire Boulevard, Ste. 1038
Beverly Hills, CA 90211
Telephone: (310) 477-5811
Email: steven@lowelaw.com

Madison A. Gregg
**MILLER SHAH LLP**
225 Broadway, Suite 1830
New York, NY 1007
Telephone (866) 540-5505
Facsimile: (866) 300-7367
Email: magregg@millershah.com

***Attorneys for Plaintiff***

COMPLAINT